# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 2:18-cr-00168-LSC-TFM |
| | ) |
| JARODERICK HARDY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OF OPINION AND ORDER

### I. Introduction

The magistrate judge to whom the defendant's "Motion to Suppress" (doc. 16) and the United States' "Response to Defense Motion to Suppress" (doc. 21) were referred has entered a Report and Recommendation recommending that the motion to suppress be granted. (Doc. 24.) The magistrate judge found that the detaining officer lacked reasonable suspicion to conduct a lawful *Terry* stop. The United States timely filed an objection to the magistrate judge's Report and Recommendation (Doc. 28). After now having thoroughly reviewed the entire record, this Court finds that the magistrate judge's Report and Recommendation is

1

not due to be adopted and accepted. Rather, for the following reasons, the motion to suppress is due to be denied.

**II.   Background**

On November 8, 2017, at 1:21 a.m., the resident of 400 West Wilding Drive called the Montgomery Police Department ("MPD") and informed the operator that she heard someone making noise outside her house and that this was the third night in a row she heard someone outside her house. The responding police officer, Joshua Howell ("Officer Howell"), who had nine months' experience as a patrol officer on the night shift in the neighboring district and who was familiar with the caller's Spring Valley neighborhood, arrived at the resident's home at 1:28 a.m., only seven minutes after the 911 call. Given that dispatch told Officer Howell that the resident "could hear someone around her house," Officer Howell treated the call as a prowler call.

After arriving at the caller's residence and failing to locate the source of the sound, Officer Howell drove around to investigate the immediate area. Officer Howell was familiar with the neighborhood, which was adjacent to his normal patrol district, and he knew that it was a "high crime area." Officer Howell knew that that "property crime," including burglary, was typical in this neighborhood.

Officer Howell had himself responded to burglary calls in this neighborhood in the past and knew that it was not uncommon for burglary suspects to be armed.

At 1:32 a.m., only 11 minutes after the resident made a call reporting that "someone" was making noise outside her house, Officer Howell encountered the defendant at the intersection of Adler and Spring Valley, which is only 0.3 miles from the residence, about a six-to-seven minute walk. Officer Howell did not see anyone else on the street other than the defendant. Based on his familiarity with the neighborhood, Officer Howell knew that it was it was uncommon for people to be out and about at 1:32 a.m. on a weeknight in this neighborhood. In addition, the defendant's all-black clothing provided further evidence in Officer Howell's calculation that the defendant was connected to the prowler call. Officer Howell knew that the MPD received calls on a daily basis describing criminal suspects wearing all-black clothing.

When Officer Howell engaged the defendant in conversation, the defendant responded evasively to Officer Howell's inquiries as to where the defendant was coming from and whether the defendant was armed. The defendant told Officer Howell that he was headed home from the store, but the nearest store had been closed for an hour and a half, and the nearest open store, Singh's Market, was approximately a mile and a half away, a thirty-minute walk. Officer Howell found

the defendant's claim that he walked thirty minutes to a store and thirty minutes back in the middle of the night in a high crime neighborhood just to get cigarillos to be unbelievable.

After noting the defendant's black clothing, evasive responses, unbelievable story for why he was out at 1:30 a.m. on a weeknight in a high crime area that often features property crime, standing only a six-to-seven minute walk from an 11-minute-old prowler call, Officer Howell testified that he believed the defendant was not only connected to the prowler call, but that the defendant was armed. Officer Howell testified that the defendant's conduct in reaching for his pockets further created officer safety concerns and influenced Officer Howell's decision to frisk the defendant for weapons. In addition to reaching into his pockets once, the defendant also kept his hands at his sides near his pockets during the entire encounter, which made Officer Howell nervous. Officer Howell knew that pockets could be where weapons are stored. Officer Howell instructed the defendant to stand still and informed the defendant that he would pat him down for weapons. Howell asked the defendant if he was armed, which resulted in the defendant pleading with Officer Howell not to shoot him, another bizarre act. The defendant complied with Officer Howell's commands to stand still and put his hands out to his sides. Officer Howell testified that "don't shoot me" is not a normal response to the question of whether

a person is armed, which further made Officer Howell suspicious that the defendant was armed. Officer Howell started his frisk at the front of the waistband where he immediately felt the pistol grip of a weapon. The weapon was secured and the defendant was charged with its possession.

## III. Standard of Review

Following a timely written objection, the standard of review for a magistrate judge's report and recommendation is *de novo*. 28 U.S.C. § 636(b)(1). *De novo* review requires the court to conduct an independent consideration of factual issues based on the record. *Jeffrey S. by Ernest S. v. State Bd. of Educ. of State of Ga.*, 896 F.2d 507, 513 (11th Cir. 1990). "If the magistrate makes findings based on the testimony of witnesses, the district court is obliged to review the transcript." *Id.*

## IV. Discussion

The *Terry* stop and subsequent pat down for weapons were lawful, and therefore the evidence obtained during the stop will not be suppressed. On the basis of the late hour, the high-crime neighborhood, the defendant's temporal and geographic proximity to a prowler call, the defendant's all-black clothing, and the defendant's evasive conduct and unbelievable story, Officer Howell had a reasonable suspicion that there was criminal activity afoot and that the defendant was connected to the prowler call. This justified a lawful *Terry* stop. Furthermore,

the defendant's reaching for his pockets and the fact that burglary suspects are often armed provided reasonable suspicion that the defendant was armed and justified Officer Howell's pat down for weapons.

### A. The seizure

The defendant seeks to suppress evidence under the Fourth Amendment's protection from unreasonable searches and seizures. *See* U.S. Const. amend. IV. Courts can order the suppression of evidence obtained in unreasonable searches and seizures. *United States v. Gilbert*, 942 F.2d 1537, 1541 (11th Cir. 1991). However, not all law enforcement encounters constitute "seizures" and merit scrutiny under the Fourth Amendment. *United States v. Jordan*, 635 F.3d 1181, 1185 (11th Cir. 2011). An encounter only becomes a seizure when an officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio,* 392 U.S. 1, 19 n. 16 (1968). Police can stop and detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity "may be afoot," even if the officer lacks probable cause. *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 30).

There are three categories of law enforcement-citizen interactions: (1) consensual police-citizen exchanges; (2) temporary detentions; and (3) full-scale

6

arrests. *United States v. Perez,* 443 F.3d 772, 777 (11th Cir. 2006). The first two categories are at issue in this case given that the decisive concerns are when the consensual encounter became a seizure, and whether the detention and accompanying pat down were supported by reasonable suspicion.

The first category of encounters, consensual and non-coercive encounters, are not seizures and do not implicate any sort of scrutiny under the Fourth Amendment. *Jordan*, 635 F.3d at 1186. The mere fact that a law enforcement officer approaches an individual on the street or asks him to answer some questions does not create a seizure. *Florida. v. Royer*, 460 U.S. 491, 497 (1983). A law enforcement encounter remains consensual if, considering all of the surrounding circumstances, "a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 436 (1991).

A consensual encounter only becomes a seizure if there is either (a) an application of physical force, even if extremely slight, or (b) a show of authority to which the subject yields. *California v. Hodari D.*, 499 U.S. 621, 625 (1991). Relevant factors include:

> Whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education and intelligence; the length of the suspect's detention and questioning; the number of police officers

> present; the display of weapons; any physical touching of the suspect, and the language and tone of voice of the police.

*Perez*, 443 F.3d at 778.

Officer Howell's stern command to "stand still" at 1:33 of the body camera footage was a show of authority sufficient to indicate a seizure pursuant to *Hodari D.* and *Bostick*. *Hodari D.* stated that tone matters, and the tone of Officer Howell's command clearly demonstrated his intention that the defendant remain where he was. As per the standard set in *Bostick*, this command initiated a seizure in that a reasonable person would not feel as if he could terminate the encounter where a law enforcement officer instructs him to remain still and informs him that he will be frisked. The defendant took a step back, but did not turn and run or display any sort of combative or uncooperative behavior beyond pleading with Officer Howell not to shoot him. Therefore, the defendant clearly complied with Officer Howell's show of authority, indicating that the seizure had in fact begun when Officer Howell ordered him to stand still.

Prior to the command to stand still, the encounter remained consensual. When Officer Howell exited his car and approached the defendant to question him, he did not block his path, did not retain his identification, and did not draw his weapon. Officer Howell simply asked the defendant a series of questions, including

where he was coming from, where he was going, and whether he was armed. As noted above in *Hodari D.*, a seizure does not occur until an officer applies physical force or displays a show of authority to which a citizen yields. Up until this point, Officer Howell had not touched the defendant nor issued any directive or displayed a show of authority that would cause a reasonable person to believe his liberty was restrained. As stated in *Royer*, the mere fact that an officer approaches an individual on the street and asks a series of questions does not turn a consensual encounter into a seizure.

Certainly, the consensual encounter became a seizure when Officer Howell ordered the defendant to raise his hands at his sides and frisked the Defendant. The significance of determining that the seizure began about a minute earlier, when Officer Howell instructed the defendant to stand still, is that the defendant's response of "please don't shoot me" would have happened after the seizure had already occurred. Therefore, the defendant's conduct in pleading "please don't shoot me," which Officer Howell believed created further suspicion that the defendant was armed, is likely excluded from the reasonable suspicion analysis. However, as will be explained below, there was already sufficient evidence from the totality of the circumstances prior to Officer Howell's command to stand still that

created reasonable suspicion that the defendant was connected to the prowler call and that the defendant may have been armed and dangerous.

### B. Reasonable suspicion for a *Terry* stop

To determine whether an investigatory stop is lawful under the Fourth Amendment, "we first ascertain whether the stop was justified at its inception." *United States v. Griffin*, 696 F.3d 1354, 1358 (11th Cir. 2012). Temporary detentions are governed by *Terry*, which held that "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot," the officer may detain the suspicious person and make "reasonable inquiries" aimed at confirming or dispelling his suspicions. *Minnesota v. Dickerson*, 508 U.S. 366, 372–73, (1993) (quoting *Terry*, 392 U.S. at 30). Whereas full-scale arrests require probable cause, *Terry* stops only require that an officer have "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *Griffin*, 696 F.3d at 1358 (quoting *Sokolow,* 490 U.S. at 7).

The mere fact that a temporary detainee's conduct was ambiguous and susceptible to innocent explanation does not establish a violation of the Fourth Amendment. *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000). The reasonable suspicion standard for *Terry* stops "accepts the risk that officers may stop innocent

people." *Id.* at 126. While officers must be able to articulate more than an "inchoate and unparticularized suspicion or 'hunch'" of criminal activity, *id.* at 124 (quoting *Terry*, 392 U.S. at 27), courts cannot reasonably demand scientific certainty from law enforcement officers. *Id.* at 125. Furthermore, courts must look at the totality of the circumstances of each case to determine whether the detaining officer has a particularized and objective basis for suspecting wrongdoing. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Officers may draw reasonable inferences about the cumulative information available to them as informed by their training and experience. *Id.*

Factors that appear innocent in isolation may warrant further investigation when taken together. *Arvizu*, 534 U.S. at 274. For example, in *Sokolow*, 490 U.S. at 3, the Supreme Court reversed the Ninth Circuit and held that Drug Enforcement Administration agents had reasonable suspicion that the defendant was transporting illegal drugs on the basis of the following six factors concerning the defendant's conduct:

> (1) he paid $2,100 for two airplane tickets from a roll of $20 bills; (2) he traveled under a name that did not match the name under which his telephone number was listed; (3) his original destination was Miami, a source city for illicit drugs; (4) he stayed in Miami for only 48 hours, even though a round-trip flight from Honolulu to Miami takes 20 hours; (5) he appeared nervous during his trip; and (6) he checked none of his luggage.

*Id*. While each of these factors alone may have innocent explanations, under a "totality of the circumstances" analysis, they create reasonable suspicion justifying a valid stop. *Id.* at 8. The Ninth Circuit had held that on the basis of these factors, "there was no evidence of ongoing criminal behavior, and thus that the agents' stop was impermissible." *Id.* at 6. The Supreme Court rejected this "overly mechanistic" requirement to identify at least one factor demonstrating evidence of ongoing criminal activity in order to establish reasonable suspicion. *Id. Sokolow* clarified that the reasonable suspicion analysis "does not deal with hard certainties, but with probabilities." *Id.* at 8. Determinations of reasonable suspicion are made on a "case-by-case determination of reasonable articulable suspicion based on *all* the facts." *Id.* at 6.

Here, there were enough specific, articulable facts prior to Officer Howell's seizure of the defendant to support a determination that Officer Howell had a reasonable suspicion that the defendant was involved in criminal activity: (1) Officer Howell was responding to a 911 call that someone was outside of a resident's home; (2) the call was made at 1:21 a.m. on a weeknight in a high crime neighborhood; (3) after seeing no one else in the area, Officer Howell located the defendant in close temporal and geographic proximity to the residence; (4) the defendant was wearing all black clothing; (5) the defendant was evasive and

provided an unbelievable story about making an hour long walking trip to a store to get cigarillos.

Officer Howell reasonably treated the call as a prowler call when he responded and investigated the residence and surrounding area. The resident of 400 West Wilding Dr. reported that "someone" was outside her house and that this was the third night in a row that she heard someone outside her home. The fact that the resident did not visually identify the source of the sound is not significant in using this call, together with other pieces of evidence, to create a reasonable suspicion of criminal activity. When dispatch relayed the call to Officer Howell, they simply told him that the resident heard someone outside her home.

Officer Howell was familiar with the neighborhood, despite it not being in his normal patrol area, due to his personal experience in responding to burglary calls in the neighborhood, which abutted his normal patrol area. Officer Howell also knew from the daily MPD roll call that this area was a high crime neighborhood that often featured property crimes, including burglary. While presence in a "high crime area" cannot alone create a reasonable suspicion of criminal activity, this factor is among the relevant contextual considerations in a *Terry* analysis. *Wardlow*, 528 U.S. at 124 (citing *Adams v. Williams,* 407 U.S. 143, 144 (1972)).

As noted in *Arvizu*, officers may draw on their training and experience in making inferences from the evidence available to them. The Supreme Court also recognizes that based on their experience, law enforcement officers can make observations about facts and behavior and infer criminal activity in situations that would elude a layman. *Ornelas v. United States*, 517 U.S. 690, 700 (1996). When Officer Howell proceeded to drive by the residence and investigate the surrounding neighborhood, he did not see anyone until he located the defendant standing on the sidewalk only a six to seven minute walk away from the residence and only 11 minutes after the call. The close temporal and geographic proximity afforded the defendant ample time to possibly have been the source of the sound outside the caller's home. Furthermore, the defendant was wearing all black clothing, which Officer Howell knew from experience is a type of attire regularly reported in connection with similar criminal calls.

Officer Howell had good reason to question the defendant and dispel the question as to whether criminal activity was afoot. Yet this Court does not need to determine whether these facts alone are sufficient to create a reasonable suspicion for a *Terry* stop because Officer Howell had not yet initiated a seizure. However, the responses to Officer Howell's consensual questioning of the defendant, the defendant's evasive conduct, and his voluntary provision of an unbelievable story

added additional facts that under the totality of the circumstances generated a reasonable suspicion to support a lawful *Terry* stop.

### C. Reasonable suspicion for a *Terry* frisk

Law enforcement officers "may take reasonable action, based upon the circumstances, to protect themselves during investigative detentions." *United States v. Hastamorir,* 881 F.2d 1551, 1556 (11th Cir.1989). Following a legitimate stop, officers may conduct a pat down and frisk detainees for weapons if the officer has a reasonable suspicion that he is dealing with an individual who may be armed and dangerous. *Terry*, 392 U.S. at 27. "Great deference is given to the judgment of trained law enforcement officers 'on the scene.'" *United States v. Chanthasouxat,* 342 F.3d 1271, 1276 (11th Cir. 2003). Furthermore, an "officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27.

Furthermore, the *type* of crime that an officer suspects to be afoot can support a reasonable suspicion that an individual is armed. *Griffin*, 696 F.3d at 1359 (citing *United States v. Moore*, 817 F.2d 1105, 1108 (4th Cir. 1987)). In *Moore*, the Fourth Circuit explicitly asserted that the suspected crime of burglary, which often

involves weapons, provides support for a determination of reasonable suspicion to frisk for weapons:

> The circumstances surrounding the stop support the officer's belief that a further frisk for weapons was warranted. The hour was late, the street was dark, the officer was alone, and the suspected crime was burglary, a felony that often involves the use of weapons.

817 F.2d at 1108.

Here, Officer Howell had a reasonable suspicion that the defendant was involved in a property crime, which creates a strong suspicion that the defendant was armed and dangerous. Officer Howell knew from his experience that the neighborhood was known for property crimes and that burglars are often armed. The facts here are similar to those in *Moore.* Here, just like in *Moore*, the officer was alone, it was dark outside, the hour was late, and most significantly, the suspected crime was a property crime, which, as Officer Howell testified, often involves weapons.

Furthermore, the defendant's conduct, namely his reaching for his pockets, further created suspicion that the defendant was a danger to Officer Howell. While the defendant only reached for his pockets once, and did not flee or make any sudden movements, he did keep his hands at his sides by his pockets during the encounter. Officer Howell, informed by his experience as a law enforcement officer, knew that pockets can be places where weapons are stored.

In summary, the *Terry* doctrine empowers law enforcement officers to temporarily detain individuals under certain circumstances to determine whether the individuals are involved in criminal activity. This *Terry* stop and subsequent pat down for weapons was lawful, and the evidence gathered will not be suppressed.

**V.     Conclusion**

Upon review of the record, the Court finds the magistrate judge's Report and Recommendation (doc. 24) is not due to be adopted and accepted but is REVERSED. The Motion to Suppress (doc. 16) is hereby **DENIED**.

**DONE** AND **ORDERED** ON AUGUST 7, 2018.

_____
L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

160704